# In the United States Court of Federal Claims

No. 12-366C
(Filed: February 22, 2013)
**TO BE PUBLISHED**

| | | |
|---|---|---|
| | ) | |
| KELLOGG BROWN & ROOT | ) | Motion to Dismiss; LOGCAP III; Cost |
| SERVICES, INC., | ) | Plus Award Fee; *Burnside-Ott Aviation* |
| | ) | *Training Ctr. v. Dalton*, 107 F.3d 854 |
| Plaintiff, | ) | (Fed. Cir. 1997); Implied Duty of Good |
| | ) | Faith and Fair Dealing; Contracting |
| v. | ) | Officer's Independent Judgment; FAR |
| | ) | 16.401; AFARS 5116.405-2(b)(2)(C); |
| THE UNITED STATES, | ) | Arbitrary and Capricious Award Fee |
| | ) | Determination; Availability of Damages. |
| Defendant. | ) | |
| | ) | |

David Kasanow, McKenna Long & Aldridge LLP, Washington, D.C., for plaintiff. Raymond B. Biagini, Alejandro L. Sarria, McKenna Long & Aldridge LLP, Washington, D.C., of counsel.

J. Reid Prouty, Senior Trial Counsel, Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, Stuart F. Delery, Acting Assistant Attorney General, Department of Justice, Washington, D.C., for defendant. Alex P. Hontos, Trial Attorney, of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge

On June 8, 2012, plaintiff, Kellogg Brown & Root Services, Inc. ("KBR") filed a complaint (docket entry 1) appealing the final decision of a United States Department of the Army ("Army") Contracting Officer ("CO") denying KBR any award fee for its performance pursuant to a contract with the Army. Plaintiff alleges that the CO's decision breached both express and implied duties of the contract, violated applicable regulations, and was arbitrary and capricious. Defendant moved to dismiss plaintiff's complaint on August 7, 2012 pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). *See* Def.'s Mot. to Dismiss ("MTD") (docket entry 6). Defendant attached a portion of the relevant contract, Clause H.36, to its motion to dismiss. *See* MTD Ex. 2 ("Clause H.36"). Defendant argued that plaintiff's breach of contract claims were improper because the Army's actions were within its discretion and that plaintiff had not stated facts sufficient to show that the actions were arbitrary or capricious. Plaintiff filed an opposition to defendant's motion, *see* Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Opp'n") (docket entry 9, Oct. 3, 2012), and defendant filed a reply in

support of its motion.  *See* Def.'s Reply in Supp. of its Mot. to Dismiss ("Reply") (docket entry 12, Nov. 5, 2012).  Plaintiff later filed a notice of additional authority (docket entry 13, Nov. 21, 2012).  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** defendant's motion to dismiss.

## I.      Background[1]

### A.      *The LOGCAP III Contract*

On December 14, 2001, the Army awarded Contract No. DAAA09-02-D-0007 ("LOGCAP III") to KBR.  Compl. ¶¶ 3–4, 11.  Under LOGCAP III, KBR provides a broad range of support services for various Army operations.  *Id.* ¶ 3.  KBR is compensated for its costs and is eligible for an additional award fee.  Clause H.36, at 1.  However, LOGCAP III "allows the Government to unilaterally vary the amount of award fee paid based on its evaluation of the [c]ontractor's performance."  *Id.*  Exactly how much discretion LOGCAP III affords the Government to "unilaterally vary the amount of the award fee" is the central issue in this case.

Sub-clause (c) of Clause H.36 establishes an "award fee pool" of three percent of "fee-bearing costs."  *Id.*  Of that three percent, one percent is a "base fee" and two percent is earnable as an "award fee."  *Id.*  The amount of the award fee depends on the Army's evaluation of KBR's performance.  Clause H.36 places initial responsibility for evaluating KBR's performance with an Award Fee Evaluation Board ("AFEB").[2]  The AFEB reviews the contractor's performance semi-annually (or more frequently), measuring it "against the LOGCAP award fee evaluation criteria."  Clause H.36, at 1.  After reviewing the contractor's performance, the AFEB then recommends an award fee to an Award Fee Determining Official ("AFDO") pursuant to sub-clause (b) of Clause H.36.  *Id.*  ("[The c]ontractor's performance shall be continually monitored by an appointed LOGCAP [AFEB].  The AFEB recommends an award fee to the AFDO after each board review.").

The AFEB begins by assigning an adjectival rating (average, good, very good, or excellent) and a numerical rating (zero to one hundred) to three evaluation factors, each consisting of three sub-factors:

> The contractor's performance will be evaluated based on the following factors and sub-factors.  Each factor (Technical Performance, Cost Performance and Management) is weighted as shown below in the determination of the award fee.  Each sub-factor under each factor is also weighted as shown to determine award fee. . . . :

---

[1] The facts are taken from plaintiff's complaint and Clause H.36 of LOGCAP III, which plaintiff referenced in the complaint and defendant attached to its motion to dismiss.

[2] An AFEB consists of appointed representatives from the Defense Contract Management Agency, the relevant military command (in this case, the Army), elsewhere in the Department of Defense, or the Department of State.  Compl. ¶ 23.

2

**Evaluation Factors and Weighting:**

**(1) Technical Performance .30**

|  |  |  |
|---|---|---|
| (a) | Adherence to Schedule | .30 |
| (b) | Quality of Work | .40 |
| (c) | Responsiveness | .30 |

**(2) Cost Performance .40**

|  |  |  |
|---|---|---|
| (a) | Cost Control | .40 |
| (b) | Government Property | .30 |
| (c) | Quality Control | .30 |

**(3) Management .30**

|  |  |  |
|---|---|---|
| (a) | Liaison | .30 |
| (b) | Program Initiatives | .40 |
| (c) | Identification and Resolution of Problems | .30 |

*Id.* at 2–3. The chart above attributes a percentage of the total available award fee to each of the three factors and nine subfactors. For example, given a total award fee pool of $100, the contractor could earn up to $30 (30 percent) based on technical performance, $40 (40 percent) based on cost performance, and $30 (30 percent) based on management. Of the $30 earnable for technical performance, the contractor could earn up to $9 (30 percent of $30) based on adherence to schedule, $12 (40 percent of $30) based on quality of work, and $9 (30 percent of $30) based on responsiveness.

Sub-clause (m) of Clause H.36 describes what percentage of the earnable award fee will be awarded[3] based on the assigned numerical rating:

> The attached Factors and Performance Category Criteria will serve as guidelines for the evaluators and AFDO to evaluate Contractor performance. For each of the weighted ratings, the following available award fee percentages apply:

---

[3] The parties dispute the effect to be given to sub-clause (m). Although plaintiff does not specifically assert that Clause H.36 grants the AFDO no discretion in its method of converting numerical ratings into a final award fee, plaintiff's arguments imply that sub-clauses (g) and (m) establish a mandatory formula for converting numerical ratings to an award fee. Opp'n 19 ("Based on the ratings 'conversion table' at H.36.m, the AFEB's overall ratings *entitled* KBR to be paid 84% of the $24,131,157 of award fee dollars available . . . ." (emphasis added)). Defendant disagrees, characterizing the chart found in sub-clause (m) as "merely 'guidelines.'" Reply 6 (quoting Clause H.36, at 4).

| Performance Standard | Numerical Rating | Percent of Available Award Fee Earned |
|---|---|---|
| Average (Range: 0 to 70) | 0–70 | 0 |
| Good (Range: Greater than 70 to 80) | 71 | 4 |
| | 72 | 8 |
| | 73 | 12 |
| | 74 | 16 |
| | 75 | 20 |
| | 76 | 24 |
| | 77 | 28 |
| | 78 | 32 |
| | 79 | 36 |
| | 80 | 40 |
| Very Good (Range: Greater than 80 to 90) | 81 | 44 |
| | 82 | 48 |
| | 83 | 52 |
| | 84 | 56 |
| | 85 | 60 |
| | 86 | 64 |
| | 87 | 68 |
| | 88 | 72 |
| | 89 | 76 |
| | 90 | 80 |
| Excellent (Range: Greater than 90 to 100) | 91 | 82 |
| | 92 | 84 |
| | 93 | 86 |
| | 94 | 88 |
| | 95 | 90 |
| | 96 | 92 |
| | 97 | 94 |
| | 98 | 96 |
| | 99 | 98 |
| | 100 | 100 |

Clause H.36, at 4. The right column of the above chart lists the percent of the award fee that the contractor earns for a given numerical rating. In the prior example, the contractor could earn up to $12 based on quality of work. If the contractor were assigned a numerical rating of ninety for quality of work, it would receive $9.60 (80 percent of $12) for that subfactor. Thus, applying both the evaluation factor weighting and the conversion chart yields a mathematical formula for converting the nine numerical ratings for each of the subfactors into a portion of the total award fee amount.

Clause H.36 also, however, grants the Government discretion over the award fee. In particular, sub-clause (h) reads:

> The amount of the award fee shall be based upon a subjective evaluation by the Government on the contractor's performance during the period in question to include considerations of the nature of the task(s) assigned and any other factors considered relevant to the determination.

*Id.* at 3. Additionally, sub-clause (b) allows the AFDO to alter the AFEB's recommended award fee. *Id.* at 1 ("The AFDO may accept the AFEB's recommendation or make a unilateral determination on the payable award fee."). The interaction between these discretion-granting provisions and the formula for converting numerical ratings into an award fee forms the crux of the parties' dispute.

### B.       *Task Orders 139 and 151*

This case involves calculation of the award fee payable to KBR for performance of Task Orders 139 and 151, under which KBR provided (among other things) laundry services; convoy support operations; dining services; and construction, operation, and maintenance of facilities in Iraq. Compl. ¶¶ 13–14. The AFDO based his determination that KBR "fail[ed] to perform at a level deserving of an award fee" on KBR's operation and maintenance of facilities in Iraq. *See id.* ¶ 62. The portion of the Task Order 139 "Statement of Work" requiring KBR to operate and maintain facilities reads:

> 8.1. FACILITIES MANAGEMENT AND OPERATIONS & MAINTENANCE (O&M) SERVICES. The contractor shall provide O&M Services and establish a preventative maintenance program to maximize life expectancy of base camp facilities at a reasonable cost to the Government. O&M consists of maintenance and repair of facilities listed in Appendix F (Facilities) . . . .
>
> 8.1.1. Operations & Maintenance also includes the repair and/or replacement of equipment and major electrical appliances such as electrical heating, air-conditioning, refrigeration systems, freezer systems, and kitchen systems used to provide services to facilities listed in Appendix F (Facilities).
>
> 8.1.2. Technical Inspection of all facilities not initially designated as "Level A" in Appendix F (Facilities) shall be completed before the contractor assumes O&M responsibilities. Upon conclusion of the technical inspection, if a facility requires substantial repairs, then those repairs will be completed in coordination with the [LOGCAP Support Officer ("LSO")] and the base camp mayor and at the direction of the ACO, prior to assuming O&M. Upon completion of Technical Inspection and correction of any deficiencies, the ACO will direct the contractor to assume O&M and amend Appendix F (Facilities).

*Id.* ¶ 14 (alteration in Compl.).

The "Mayoral Cell," a group of military personnel (i.e., not KBR), designates the level of maintenance KBR is required to provide to each building. *Id.* ¶ 16. Appendix F to the Statement of Work, as excerpted in plaintiff's complaint, sets forth various "levels of maintenance" KBR would provide for different classes of buildings, as directed by the Mayoral Cell:

F.1. Appendix F applies to all facilities (such as hard structure buildings, guard towers, etc.) located on military base camps. The appendix is subdivided into three Levels: A, B and C. . . .

F.1.1. Determination for the total number of buildings located on a particular facility is a joint effort between the Mayoral Cell and the contractor.

F.1.2. Prioritization of facility levels (A, B and C) is the responsibility of the Mayoral Cell.

F.2. There are two levels of maintenance that the contractor shall provide: Level A, Full Maintenance and Level B, Limited Maintenance. Facilities prioritized into Level C receive no contractor maintenance.

F.2.1. Level A, Full Maintenance.

F.2.1.1. The contractor shall provide maintenance on any items pertaining to these facilities that can be repaired (such as plumbing, electrical, HVAC, roofs, floors, windows, doors, walls and grounds around the facilities) and provide preventative maintenance (such as change out of filters, HVAC cleaning, etc).

F.2.1.2. *The Government will initiate a service request for all maintenance repairs pertaining to Level A.*

* * *

F.2.2. Level B: Limited Maintenance.

F.2.2.1. Limited Maintenance does not include inspections, preventative maintenance and upgrades.

F.2.2.2. Upon receipt of service request, the contractor shall conduct an assessment to determine feasibility of repair or replacement of existing items. The assessment shall be provided to the Mayoral Cell.

F.2.2.2.1. If the assessment determines repair or replacement is warranted, *the contractor shall repair or replace existing items only.*

F.2.2.2.2. Repair or replacement of existing items is defined as items, which currently exist in the facility, and are within current funding streams.

F.2.2.2.3. If the assessment exceeds the scope of repair or replacement; the contractor shall return the service request to the Mayoral Cell for disposition.

F.2.2.3. *Any repairs or replacement that need to be done on the facility will be initiated with a service request by the customer.*

* * *

F.3. Facility determination and prioritization should be reviewed jointly between the Mayoral Cell and the contractor.

F.4. Preventive Maintenance:

F.4.1. A Category. Inspection should be conducted every 60 days, but can be modified by the base camp mayor for more or less frequent inspections on an individual basis. The purpose of these inspections is for safety and to save the [G]overnment money by identifying deficiencies while they are still small and easy to fix. Inspection should include but is not limited to the following:

F.4.1.1. *Electrical. Check for damage or tampering with switches, outlets, junction boxes, control panels, circuit breakers, fuses, grounding rods, and overloading.*

F.4.1.2. Plumbing. Check for leaks, drips, corrosion in showerheads, shower curtains, water pressure, hot water temperature, and evidence of water damage to floors and walls.

\* \* \*

F.4.2. B Category. Contractor shall provide service support either by service order or ACL. Upkeep and inspection not part of services. Power generation: check based on Power Generation tab contained in the Consolidated MSOW and MSOW.

Compl. ¶ 15 (second, third, and fourth omissions in Compl.) (emphasis added in Compl.). In summary, Level A facilities require full maintenance, including preventive maintenance, but Level B facility maintenance includes only repair or replacement of existing systems. *Id.* ¶¶ 15, 17. At Level B facilities, KBR will only fix what is broken; it is not responsible for preventive maintenance or upgrades. *Id.* ¶ 17. Finally, KBR is not responsible for any maintenance of Level C buildings. *Id.* ¶ 15.

C. *Radwaniyah Palace*

On January 2, 2008, Staff Sergeant Ryan Maseth was electrocuted while showering in Legion Security Force Building 1 ("LSFB1") of the Radwaniyah Palace Complex ("RPC") near Baghdad. Compl. ¶¶ 27–28. The electrocution was caused by a short circuit in the water pump on the roof of LSFB1. *Id.* ¶ 29. LSFB1, like most other Iraqi-constructed buildings, was equipped with an ungrounded electrical system. *Id.* Plaintiff cites a report from the Department of Defense Inspector General concluding that the Army was aware of the ungrounded electrical system when it hired a local Iraqi contractor to rewire and ground the electrical system in December 2003. *Id.* ¶¶ 31–32.

KBR's involvement with RPC apparently began on February 8, 2007, when the Army requested from KBR an estimate for Level A maintenance service of 126 buildings at RPC, including LSFB1. *Id.* ¶ 38. Based on KBR's estimate, the Army determined that Level A maintenance was too expensive and asked KBR to prepare an estimate for Level B maintenance

instead. *Id.* KBR's Level B estimate explicitly assumed the 126 RPC buildings were "up to the quality standards of LOGCAP." *Id.* ¶ 40. On February 23, 2007, the Army accepted KBR's estimate for Level B maintenance of the 126 buildings. *Id.* ¶ 41.

KBR inspected RPC buildings, including LSFB1, starting in February 2007, and "noted substantial deficiencies with electrical systems . . . , specifically with grounding and bonding." *Id.* ¶¶ 41–42. KBR reported these results to the Army in November 2007. *Id.* ¶ 56. The Army never directed KBR to repair the deficiencies KBR identified. *Id.* ¶ 45. KBR alleges that correcting the electrical deficiencies would have been "outside the scope of operations and maintenance under LOGCAP III Task Order 139," implying that neither Level B maintenance nor Level A maintenance would have involved grounding the electrical systems. *Id.* KBR also alleges that the Inspector General of the Department of Defense conducted an investigation and concluded that the Army's "actions during contract negotiations transferring RPC facility operations and maintenance to LOGCAP III resulted in incomplete knowledge of facility conditions and assumption of undetermined risk by the Government." *Id.* ¶ 41.

### D. *Award Fee Determination Procedural History*

An AFEB convened in June 2008 to evaluate KBR's performance under Task Orders 139 and 151 from January 1, 2008 through April 30, 2008. Compl. ¶ 46. The AFEB assigned KBR "consistently high ratings" for technical performance despite the electrical problems at RPC, which the AFEB factored into its evaluation and ratings. *Id.* ¶¶ 48–49. KBR received numerical ratings of ninety-two out of one hundred for its overall performance under Task Order 139 and ninety-five out of one hundred for its overall performance under Task Order 151. *Id.* ¶ 50. In August 2008, however, the Army CO sent KBR a letter informing KBR that the Army's final award fee decision would be delayed indefinitely. *Id.* ¶ 52.

The CO authored a memorandum dated December 13, 2009 containing several criticisms of KBR's performance. *Id.* ¶ 53. The memorandum asserted that KBR's Level B maintenance estimate "would have included the cost of repairing [electrical] deficiencies [in LSFB1]." *Id.* ¶ 55 (alterations in Compl.). Additionally, the CO concluded that "no clear evidence exists" that KBR provided "a listing of the deficiencies" to the Army. *Id.* ¶ 56. The CO also criticized KBR for employing electrical personnel who lacked the credentials that are required in the United States. *Id.* ¶ 57.

In a letter dated February 19, 2010, the AFDO determined that KBR should not be paid an award fee for its performance under Task Orders 139 and 151 between January 1, 2008 and April 30, 2008. *Id.* ¶ 61. The AFDO based its determination upon "KBR's failure to document the poor conditions of the electrical systems at the Radwaniyah Palace Complex, KBR's failure to provide notice of unsafe life, health and safety conditions, and KBR's failure to employ qualified personnel to provide electrical services." *Id.* ¶ 62. By letter dated March 9, 2010 and during a meeting on July 26, 2011, KBR attempted to persuade the AFDO and CO to reconsider the award fee determination. *Id.* ¶¶ 64–65. The CO sent an email to KBR on July 28, 2011, notifying KBR that she would not recommend reconsideration of the award fee. *Id.* ¶ 66.

KBR submitted a certified claim to the CO under 41 U.S.C. § 7103 on December 1, 2011. *Id.* ¶ 67. The CO requested a meeting with KBR that took place on March 2, 2012. *Id.* ¶ 68. On

March 12, 2012, KBR received the CO's final decision denying KBR's certified claim. *Id.* ¶ 69. Thereafter, KBR filed its complaint alleging that the AFDO's decision both breached the contract and abused the discretion granted to him under the contract.

## II. Analysis

To survive a motion to dismiss, plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678. Plaintiff's allegations must show more than a possibility of liability, but not necessarily a probability. *Id.*

The Court reviews the CO's decision by interpreting the contract *de novo*, 41 U.S.C. § 7104(b)(4), but giving deference to the discretion granted to the CO by the terms of the contract. *Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854, 859–60 (Fed. Cir. 1997).

### A. Jurisdiction

The Court has jurisdiction over plaintiff's claims. 41 U.S.C. § 7104(b)(1) ("[A] contractor may bring an action directly [appealing the decision of a CO] in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary."); 28 U.S.C. § 1491(a)(1)–(2) ("The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of [T]itle 41 . . . ."). Defendant does not challenge this Court's jurisdiction.

### B. Breach of Contract

There is no dispute that LOGCAP III is a valid contract between the parties. Plaintiff alleges that defendant breached two duties arising out of the contract. The first, plaintiff asserts, arises out of Clause H.36 of LOGCAP III and establishes a mandatory method for converting numerical ratings to award fee amounts. Compl. ¶¶ 26, 61–62, 72, 76–77. The other is the implied duty of good faith and fair dealing. *Id.* ¶¶ 75, 77.

#### 1. Plaintiff's Complaint Adequately Pleads a Claim for Breach of Clause H.36

Clause H.36 of LOGCAP III governs the award fee payable to plaintiff. *See* Clause H.36. Under sub-clause (b), the LOGCAP AFEB is initially responsible for making an award fee recommendation. *Id.* at 1. The AFDO then "may accept the AFEB's recommendation or make a unilateral determination on the payable award fee." *Id.*

The parties dispute what discretion Clause H.36 provides to the AFDO in making this "unilateral determination." Defendant argues that Clause H.36 places the award fee determination within the AFDO's sole discretion, and therefore the AFDO's decision must be upheld unless it was an abuse of that discretion. MTD 5 (citing *Burnside-Ott*, 107 F.3d at 859–60). Plaintiff responds that the conversion of the numerical ratings to an award fee is established

9

by Clause H.36 and is therefore outside the AFDO's discretion. Opp'n 6.[4] The parties' dispute turns then on whether Clause H.36 mandates that the AFDO apply the conversion chart and/or evaluation factor weighting or whether the AFDO has discretion to ignore the conversion chart and evaluation factor weighting.

Defendant cites *Burnside-Ott* for the proposition that "award fee cases are reviewed upon the basis of whether the [AFDO] acted arbitrarily and capriciously." Reply 1–2. But defendant overstates the holding of *Burnside-Ott*. The plaintiff in that case, Burnside-Ott Aviation Training Center ("Burnside-Ott"), challenged the award fee conversion method used by the Navy AFDO under a cost-plus-award-fee contract. 107 F.3d at 856. Similar to LOGCAP III, the *Burnside-Ott* contract provided that the award fee was to be "based on a unilateral determination by the Government," and calculated based on numerical ratings corresponding to evaluation criteria set forth in the contract. *Id.* Unlike LOGCAP III, however, the *Burnside-Ott* contract did not include any method for converting the numerical ratings into an award fee. *Id.* Burnside-Ott's theory was that, in the absence of any indication to the contrary, the contract required a "1-to-1" conversion from the numerical ratings to the award fee (e.g., a performance rating of eighty would have earned Burnside-Ott 80 percent of the award fee pool). *Id.* at 856–57. The Navy AFDO, in contrast, converted Burnside-Ott's numerical performance ratings into its award fee using a method similar to the conversion chart contained in sub-clause (m) of Clause H.36.[5] The Navy AFDO's conversion method "had been used on other [Cost Plus Award Fee ("CPAF")] contracts." *Id.*

---

[4] The specifics of plaintiff's position are not entirely clear. Plaintiff's complaint does not specifically characterize the evaluation factor weighting and conversion chart as mandatory. *See, e.g.*, Compl. ¶ 24 ("The H-36 Award Fee Clause requires the AFEB and the AFDO to evaluate KBR's performance based on three evaluation 'factors' . . . . These factors and subfactors are organized and weighted as follows . . . . The purpose of these weightings is 'to determine the award fee.'"). Plaintiff's response to defendant's motion to dismiss repeatedly refers to the "mandatory requirements of the H.36 Award Fee Clause," but the response does not specify exactly what those requirements are (or conversely, how far the AFDO's discretion extends). Moreover, while not explicitly conceding the point, plaintiff also does not challenge the AFDO's discretion to adjust the AFEB's evaluations and numerical ratings. *See* Opp'n 5 n.2 (discussing the different applicable standards of review for violations of mandatory and discretionary contractual provisions). Of course, such an adjustment would have also altered the award fee. Based on the facts alleged in plaintiff's complaint, however, the AFDO made no such adjustment to the AFEB's evaluations or numerical ratings. Compl. ¶ 62 ("[T]he AFDO did not purport to apply the award fee procedures, criteria, and evaluation weighting scheme established by [Clause H.36.]").

[5] The Navy AFDO converted performance ratings below sixty to an award fee of zero. *Id.* at 856. For performance ratings between sixty and one hundred, the Navy AFDO awarded a percentage of the available award fee spread linearly over that range. *Id.* For example, if the contractor earned a performance rating of eighty, the Navy AFDO would have awarded 50 percent of the award fee (as eighty is halfway between sixty and one hundred). *Id.* at 857.

10

The Federal Circuit held that the Navy AFDO's conversion method was within the discretion granted to the AFDO by the contract. *Id.* at 860. As to the standard of review, the court clarified that it interpreted the contract *de novo*, but that it would defer to the Navy AFDO's award fee determination because the contract provided that "[t]he Award Fee decision is a unilateral determination made by the [A]FDO." *Id.* at 859. Thus, first, under the court's *de novo* interpretation of the contract, it found "no ambiguity in the contract and that the [A]FDO here had the authority to act unilaterally." *Id.* at 860. Second, the court upheld the Navy AFDO's conversion method because there was no evidence that it was arbitrary or capricious. *Id.* In summary, *Burnside-Ott* held that contractual language granting the AFDO "unilateral discretion" allowed the AFDO to take any reasonable action in a situation where nothing was specifically required or prohibited by the contract. Because of the following factual differences between this case and *Burnside-Ott*, however, *Burnside-Ott* does not provide a basis for dismissing plaintiff's breach of contract claim.

First, unlike the contract in *Burnside-Ott*, Clause H.36 is ambiguous with regard to whether the conversion method is within the AFDO's discretion. KBR asserts that the conversion chart provides the required method for converting the numerical ratings into an award fee amount. Compl. ¶¶ 26, 62, 72, 76–77. As defendant notes, there is evidence to support the interpretation that the conversion chart merely presents guidelines for evaluating the contractor's performance and is nowhere specifically characterized as mandatory.[6] On the other hand, there is also evidence that the conversion chart in sub-clause (m) was intended to be a mandatory requirement.[7] *Burnside-Ott* does not resolve this ambiguity, as the contract in that case did not contain a chart like the chart in sub-clause (m), or any similar provision. 107 F.3d at 856.

Second, this case differs from *Burnside-Ott* because the AFDO in this case did not merely choose a different formula from the one plaintiff anticipated to convert numerical ratings into an award fee, as in *Burnside-Ott*. *See id.* at 856–57. Rather, plaintiff alleges the AFDO departed altogether from the practice of formulaically converting numerical ratings into an award fee using the evaluation factor weighting set forth in sub-clause (g) of Clause H.36. Compl. ¶ 62; *see also* Clause H.36, at 2–3 ("Each sub-factor under each factor is also weighted as shown to determine the award fee."). Thus, despite KBR's "consistently high ratings for its overall and technical performance," Compl. ¶ 48, the AFDO reduced KBR's award fee to zero, in conflict with the provisions of Clause H.36 that describe a mathematical formula for conversion of

---

[6] *See* Clause H.36, at 1 ("A CPAF contract . . . allows the Government to unilaterally vary the amount of award fee paid based on its evaluation of the Contractor's performance."); *id.* ("The AFDO may accept the AFEB's recommendation or make a unilateral determination of the payable award fee."); *id.* at 3 ("The amount of the award fee shall be based upon a subjective evaluation by the Government . . . .").

[7] The first sentence of sub-clause (m) describes "[t]he attached Factors and Performance Category Criteria" as "guidelines." Clause H.36, at 4. This sentence appears to refer to a matrix attached to sub-clause (m) detailing the performance standards that merit each of the adjectival ratings. The second sentence, however, leaves less room for the AFDO's discretion: "For each of the weighted ratings, the following available award fee percentages apply[.]" *Id.* The second sentence is specific to the conversion chart that immediately follows. *See id.*

11

ratings into a fee. While *Burnside-Ott* held that the AFDO in that case had discretion to determine the conversion method since none was specified in the contract, the holding did not speak to the AFDO's discretion (or lack thereof) to disregard completely the evaluation factor weighting that is set forth in the contract.

*Burnside-Ott* does not foreclose plaintiff's claims that the Army breached mandatory provisions of Clause H.36. Clause H.36 does not clearly resolve whether the AFDO's discretion extended to his calculation of the award fee or was limited to amending the AFEB's evaluations and numerical ratings. Because Clause H.36 is ambiguous, the Court must deny defendant's motion to dismiss plaintiff's claim that the Army breached Clause H.36.[8]

### 2. Plaintiff Does Not Adequately Plead Any Breach of the Implied Duty of Good Faith and Fair Dealing

The Court interprets LOGCAP III, like any contract, to impose on both parties an implied duty of good faith and fair dealing in their performance of the contract. Restatement (Second) of Contracts § 205 (2012). "[T]he significance of the doctrine is 'in implying terms in the agreement.'" *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (D.C. Cir. 1984) (Scalia, J.) (quoting Farnsworth, *Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code*, 30 U. Chi. L. Rev. 666, 670 (1963)). The Restatement of Contracts describes the duty as depending on the conduct at issue:

> The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.

Restatement (Second) of Contracts § 205(a). Thus, in general, the standard for determining what constitutes a violation of the duty depends on the factual context.

---

[8] While contract interpretation is a question of law, it would be inappropriate for the Court to resolve the ambiguity in this Opinion. *Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992) (finding construction of an ambiguous contract provision a factual determination precluding dismissal on a motion for failure to state a claim); *Citadel Group Ltd. v. Sky Lakes Med. Ctr., Inc.*, No. 06-C-6162, 2008 WL 1924958, at *4 (N.D. Ill. Apr. 30, 2008) ("If the court cannot [resolve the ambiguity without the use of extrinsic evidence], the ambiguity cannot be resolved on a motion to dismiss because that would require consideration of questions of fact and matters outside the pleadings."). "If the contract language is latently ambiguous, the contractor is entitled to recovery based on a reasonable interpretation of the contract. If the contract language is patently ambiguous, however, the contractor must inquire about the ambiguity before bidding." *Burnside-Ott*, 107 F.3d at 860 (citing *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 1996)).

a.      Plaintiff's Allegations of Violations of the Contract or Regulations Do Not Support a Claim for Breach of the Duty of Good Faith and Fair Dealing

Plaintiff's complaint alleges that defendant breached the duty of good faith and fair dealing by violating both Clause H.36 and applicable regulations. Compl. ¶¶ 75, 77. Defendant requests that the Court dismiss this claim because "proof of mere breach of the contract's terms" is insufficient to plead a breach of the duty of good faith and fair dealing. Reply 4.

The duty of good faith and fair dealing allows the Court to infer obligations into contracts when the parties' negotiations or drafting failed, for one reason or another, to account for circumstances that later developed. *See Precision Pine & Timber Inc. v. United States*, 50 Fed. Cl. 35, 61 (2001) ("'What courts are doing here [in recognizing implied duties] . . . is but a recognition that the parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate[] about these expectations.'" (first alteration in original) (quoting 3 *Corbin on Contracts* § 570(A) (Supp. 2000))), *rev'd in part on other grounds*, 596 F.3d 817. But the duty does not alter obligations that arise out of the express language of the contract. *Scott Timber Co. v. United States*, 692 F.3d 1365, 1375 (2012) ("'[T]he assertion of a legitimate contract right cannot be considered as violative of a duty of good faith and fair dealing.'" (quoting *David Nassif Assocs. v. United States*, 644 F.2d 4, 12 (Ct. Cl. 1981))); *Precision Pine & Timber Co. v. United States*, 596 F.3d 817, 831 (2010) ("The implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions."); *see also Bell/Heery v. United States*, 106 Fed. Cl. 300, 313 (2012) ("In short, having expressly assumed responsibility for compliance with New Hampshire law, plaintiff cannot invoke the implied covenant of good faith and fair dealing to shift that responsibility to defendant.").

In contrast to cases that require courts to invoke the duty of good faith and fair dealing, the Court need not create obligations not found in LOGCAP III because Clause H.36 does not fail to account for the AFDO's discretion in evaluation factor weighting and converting numerical ratings into an award fee. Rather, it contains multiple provisions that can be read to resolve the question of the AFDO's discretion, but these provisions create conflicting results. Clause H.36, at 1–4; *see also* Reply 6 (describing conflict among sub-clauses). Sub-clauses (b) and (h) grant the AFDO significant discretion in making the award fee determination, but sub-clauses (g) and (m) specify rules for determining the award fee. Clause H.36, at 1–4; *cf. Burnside-Ott*, 107 F.3d at 860 (finding no ambiguity in the contract and authority for the Navy AFDO to act unilaterally where there was no "part of the contract that require[d] the award fee to correspond directly with the performance rating").

If plaintiff's interpretation of Clause H.36 is correct, the AFDO's award fee determination was a breach of the express provisions of sub-clauses (g) and (m), and there is accordingly no need to resort to the implied duty of good faith and fair dealing to infer any obligations into the contract. If, on the other hand, defendant's interpretation of Clause H.36 is correct, the AFDO's determination was within the discretion granted to him by the contract, and the Court cannot use the implied duty of good faith to alter defendant's duties expressed in the

13

contract. Therefore, in either case, plaintiff has not pled facts sufficient to support a claim for breach of the implied duty of good faith and fair dealing.[9]

> b. Plaintiff Does Not Plead Facts Sufficient to Support Its Claim That the AFDO Did Not Exercise Independent Judgment

Plaintiff also argues that the complaint states a claim that the Army violated the duty of good faith and fair dealing because the AFDO's award fee determination did not result from his independent judgment. Opp'n 14–16 (citing Compl. ¶¶ 63, 75, 77). Defendant contends that this claim should be dismissed because the allegations in plaintiff's complaint are conclusory and provide no "particular basis to believe that the AFDO violated the duty." MTD 3, 7–8.

A CO's decision must be based on his or her independent judgment. *Atkins N. Am., Inc. v. United States*, 106 Fed. Cl. 491, 499 (2012) (citing *Pac. Architects & Eng'rs Inc. v. United States*, 491 F.2d 734, 744 (Ct. Cl. 1974)). Decisions that result from sources other than the contracting officer's independent judgment can constitute a breach of the duty of good faith and fair dealing. *See N. Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 209–12 (2007). This is particularly true, as in *North Star*, where the decision implicates the CO's duty to "'[e]nsure that contractors receive impartial, fair, and equitable treatment.'" *Id.* at 209 (alteration in original) (quoting FAR 1.602-2).

Plaintiff has not pled sufficient facts, however, to allow the Court to reasonably infer that the AFDO did not exercise independent judgment. *See Iqbal*, 556 U.S. at 678. Plaintiff argues that it alleges the claim in paragraphs sixty-three, seventy-five, and seventy-seven of its complaint. Opp'n 14–16. Paragraphs seventy-five and seventy-seven of plaintiff's complaint, however, make no reference to the AFDO's exercise of independent judgment. While paragraph sixty-three does allege that the AFDO did not exercise independent judgment, the allegation is based on an unexplained citation to a Senate Budget Committee hearing.

Plaintiff explained this citation in its response to defendant's motion to dismiss. *Id.* Plaintiff quotes Mr. Shay Assad, who was "responsible for all Department of Defense acquisition and procurement policy matters." Opp'n Ex. 1, at KBR0003. Mr. Assad testified:

---

[9] To the extent that plaintiff's claim for breach of the implied duty of good faith and fair dealing attempts to read regulations into LOGCAP III, plaintiff's claim must still be dismissed. *See Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1314 n.6 (Fed. Cir. 2011) ("[W]e do not suggest that the . . . regulation should be read into the contracts. Rather, the regulation applies of its own force and directly governs the parties' performance under the contracts.").

Senator, in fact . . . the information there is not exactly accurate. The fact is *we paid zero award fee to KBR* during that period of time for which *we deemed them to have unsatisfactory quality oversight of their electrical performance.* That was between, I think, the period January of 2008 to around May of 2008.

\* \* \*

But *we actually awarded them zero,* irrespective of what they performed during that period. It was zero award fee. *My office oversaw that.*

Opp'n 15 (alteration in Opp'n) (emphasis added in Opp'n). Mr. Assad testified that his office "oversaw" the award fee. Opp'n Ex. 1, at KBR0012. Plaintiff does not allege that Mr. Assad testified that he determined the award fee, but only that he "oversaw" the determination. But oversight by Mr. Assad's office does not itself breach the AFDO's duty to exercise independent discretion. *Cf. Boeing Co. v. United States*, 75 Fed. Cl. 34, 47 (2007) ("[C]oncurrence by DOE's headquarters . . . did not, by itself, breach the contract. The governing consideration [is] whether the award fee decision could be said to reflect the judgment of the contractually designated officers or someone else.").

Absent supporting facts or other explanation, plaintiff's allegation that the AFDO did not exercise his own independent judgment is a "'legal conclusion couched as a factual allegation,'" and the Court will not assume it to be true. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Thus, plaintiff has not adequately pled its claim for breach of the duty of good faith and fair dealing based on the AFDO's failure to exercise his own independent judgment. *See Brock v. United States*, No. 11-176 C, 2012 WL 2057036 (Fed. Cl. June 7, 2012) (finding allegations of bad faith "based on mere innuendo and speculation" to be insufficient to state a claim of breach of the duty of good faith and fair dealing).

### C. Abuse of Discretion

Plaintiff alleges that the AFDO abused the discretion afforded him by LOGCAP III by violating applicable regulations and taking arbitrary and capricious actions. *See Burnside-Ott*, 107 F.3d at 860 (allowing for reversal of the AFDO's decision if "the discretion employed in making the decision is abused, for example, if the decision was arbitrary or capricious").

#### 1. Violation of Regulations

Plaintiff's complaint references two regulations: FAR 16.401 and Army Federal Acquisition Regulation Supplement 5116.405-2(b)(2)(C) ("AFARS"). Compl. ¶¶ 73–74. The complaint also alleges generally that the AFDO's award fee decision violated "applicable regulations" (presumably these same two). *Id.* ¶¶ 76–77. Defendant argues that plaintiff's complaint fails to allege facts demonstrating violations of either of these regulations.

##### a. Plaintiff Adequately Pleads That the AFDO Violated FAR 16.401

Plaintiff's complaint quotes the current version of FAR 16.401, which reads: "Award fee shall not be earned if the contractor's overall cost, schedule, and technical performance *in the aggregate* is below satisfactory." FAR 16.401(e)(2) (2011) (emphasis added). Plaintiff points to

the response of the Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (the "FAR Councils") to a comment addressing facts similar to the facts of this case:

> Comment: Two respondents commented on the need to clarify whether an unsatisfactory evaluation in one category (e.g., cost) requires an overall unsatisfactory rating and thus no award fee in any category (e.g., schedule and technical) for the evaluation period.
>
> Response: The Council's [sic] intent with the use of "overall cost, schedule, and technical performance in the aggregate" is to avoid the situation where, for example, contractors would receive no award fee in an evaluation period if they were rated below satisfactory on one of the criteria (e.g., in schedule performance) and above satisfactory in other criteria (e.g., technical and cost performance). The Councils believe that this would not be equitable. In such a situation, the contractor could receive a reduced percentage of the award-fee amount to account for the below satisfactory schedule performance, but they would not receive 100 percent of the award-fee amount, nor would they receive zero award fee for that evaluation period. The final rule adds clarifying language of "in the aggregate" to FAR 16.401(e)(2), Table 16-1, and FAR 16.401(e)(3)(v), to make it clear that the objective is to consider overall cost, schedule, and technical performance in performing award-fee assessments.

Award-Fee Language Revision, 75 Fed. Reg. 60,261-01, 60,261 (Sept. 29, 2010). The facts alleged in plaintiff's complaint are clearly sufficient to plead a claim that the AFDO's decision to reduce KBR's award fee to zero violated the current version of FAR 16.401(e)(2).

Defendant does not dispute plaintiff's interpretation of the current FAR 16.401, but instead observes that neither the phrase "in the aggregate" nor the FAR Councils' explanation were in effect when the AFDO issued his decision. MTD 8–9. Indeed, the AFDO issued his decision on February 19, 2010, Compl. ¶ 61, while the FAR Councils' explanation was published in the Federal Register on September 29, 2010, and "in the aggregate" was added to FAR 16.401(e)(2) on October 29, 2012. 75 Fed. Reg. at 60,261. Plaintiff argues, however, that the added language was intended to be a clarification, and thus the Court should apply the FAR Councils' explanation retroactively. Opp'n 9–10.

Regulations are only applied retroactively if their language so requires. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 264 (1994). The addition of "in the aggregate" to FAR 16.401(e)(2)—a change made "for clarification"—was not effective until October 29, 2012. 75 Fed. Reg. at 60,261. Plaintiff cites *Boeing North American, Inc. v. Roche* for the proposition that "clarifying" amendments to regulations should be read retroactively. Opp'n 9 (citing 298 F.3d 1274, 1288 n.17 (Fed. Cir. 2002)). That case involved FAR 31.205-47(c)(2) (2000), which did not yet exist in 1989, the relevant year. 298 F.3d at 1288 n.17. The agencies specifically stated that FAR 31.205-47(c)(2) should apply retroactively, noting that it was consistent with previous audit guidance issued by the Defense Contract Audit Agency. Small Entity Compliance Guide, 63 Fed. Reg. 58,608-01, 58,609 (Oct. 29, 1998). In this case, however, the FAR Councils have not spoken directly to the retroactive application of the addition of "in the aggregate" to

16

FAR 16.401(e)(2).  Neither does plaintiff cite any court's or administrative body's interpretation of the prior language of FAR 16.401(e)(2).  Thus, *Boeing North American* does not compel retroactive application of the new version of FAR 16.401(e)(2) containing the phrase "in the aggregate."

Nevertheless, plaintiff's complaint sufficiently pleads a violation of the version of FAR 16.401(e)(2) that was in effect when the AFDO issued his decision.  At that time, FAR 16.401(e)(2) read:

> The amount of award fee earned shall be commensurate with the contractor's overall cost, schedule, and technical performance as measured against contract requirements in accordance with the criteria stated in the award-fee plan.  Award fee shall not be earned if the contractor's overall cost, schedule, and technical performance is below satisfactory.

FAR 16.401(e)(2) (2009).  The addition of "in the aggregate" appears to have merely duplicated the meaning of the existing modifier "overall."  *See Lane v. Principi*, 339 F.3d 1331, 1340 (Fed. Cir. 2003) ("To interpret a regulation, we . . . look at its plain language and consider the terms in accordance with their common meaning." (quoting *Lockheed Corp. v. Windnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997)) (alteration in original) (internal quotation marks omitted)).  Moreover, even though the complaint does not quote the first sentence of FAR 16.401(e)(2), the complaint alleges that the AFDO's award fee decision was not in accordance with the criteria stated in the award fee plan contained in Clause H.36.  Compl. ¶¶ 7, 22, 24, 53, 62, 71–72, 76–77.  Although plaintiff might have provided a more detailed explanation of how the AFDO's decision violated FAR 16.401(e)(2), the complaint does allege facts sufficient to state a claim for violation of that provision.

>           b.        Plaintiff Does Not Adequately Plead That the AFDO Violated
>                     AFARS

According to plaintiff's complaint, AFARS requires the AFDO, when altering the AFEB's recommended award fee, to document his reasoning "in sufficient detail to show that the integrity of the award fee determination has been maintained."  Compl. ¶ 74.  Plaintiff's complaint does not attach this provision, nor does it identify exactly what detail is missing from the AFDO's decision.

Plaintiff explains in its opposition brief that its objection is specifically to the AFDO's failure to document errors of the AFEB's recommendation.  Opp'n 11 ("[T]he AFDO's letter contains virtually no explanation of his decision to ignore the AFEB's recommendation, except for a single, cryptic statement that he had access to certain 'additional information regarding KBR's performance' that the AFEB did not.").  Plaintiff offers no basis, however, why the Court should interpret AFARS as requiring the AFDO to explain the errors of the AFEB's recommendation.  Indeed, such a requirement would arguably conflict with Clause H.36.  Sub-clause (b) of Clause H.36 allows the AFDO to "accept the AFEB's recommendation or make a *unilateral* determination on the payable award fee."  Clause H.36, at 1 (emphasis added).  "Unilateral" means "[o]ne-sided; relating to only one of two or more persons or things."  *Black's Law Dictionary* 1671 (9th ed. 2009).  The award fee is to be "based on a *subjective* evaluation."

Clause H.36, at 3 (emphasis added). The AFDO may subjectively disagree with the AFEB's recommendation without objectively viewing the AFEB's recommendation to necessarily be in error. Requiring the AFDO to explain the AFEB's errors would replace the AFDO's subjective discretion with deference to the subjective discretion of the AFEB where the AFEB's recommendation is not objectively incorrect. Accordingly, plaintiff's interpretation of AFARS would not maintain, but in fact would alter the "integrity" of the award fee determination. Therefore, the Court does not read AFARS to require the AFDO to explain the errors of the AFEB's recommendation.

Defendant argues that the AFDO satisfied AFARS because the AFDO documented the justification for his decision, MTD 9, "explained the basis for his decision in sufficient detail for a reviewer to understand it," and "incorporated multiple extensive (and detailed) documents to support [his] conclusions." Reply 9. Plaintiff does not appear to disagree with defendant's contentions. Indeed, the complaint acknowledges that the AFDO based his decision on his factual findings of (1) "KBR's failure to document the poor conditions of the electrical systems at the Radwaniyah Palace Complex[; (2)] KBR's failure to provide notice of unsafe life, health and safety conditions[;] and [(3)] KBR's failure to employ qualified personnel to provide electrical services under Task Orders 139 and 151 across the KBR areas of responsibilities." Compl. ¶ 62. Therefore, the AFDO's decision complied with AFARS. Accordingly, plaintiff's claim that the AFDO's decision violated AFARS must be dismissed.

2.  Plaintiff Adequately Pleads That the AFDO's Decision Was Arbitrary and Capricious Because the AFDO Relied upon Factual Determinations Based on Fundamentally Inaccurate Information

Plaintiff alleges that the AFDO abused the discretion granted to him in LOGCAP III by arbitrarily and capriciously basing his decision on "fundamentally inaccurate information."[10] Compl. ¶¶ 76–77. Plaintiff pleads facts that directly contradict the AFDO's findings. Plaintiff alleges that it inspected buildings and "noted substantial deficiencies with electrical systems, and documented a host of problems, specifically with grounding and bonding" and reported these results to the Army. Id. ¶ 42 (internal quotation marks omitted). This contradicts the AFDO's findings of "KBR's failure to document the poor conditions of the electrical systems at the Radwaniyah Palace Complex" and "KBR's failure to provide notice of unsafe life, health and safety conditions." Id. ¶ 62. Plaintiff also alleges that the "Qualifications and Credentials" clause upon which the CO based her conclusion that KBR employed underqualified electricians was not incorporated into LOGCAP III until July 2008. Id. ¶ 57. For the purpose of deciding this motion to dismiss, the Court accepts plaintiff's well-pled factual allegations as true. Iqbal,

---

[10] While plaintiff argues that the AFDO's decision was arbitrary and capricious because it was based on "fundamentally inaccurate information," plaintiff's complaint also takes issue with the CO and AFDO's various interpretations of LOGCAP III. See Compl. ¶¶ 15–21, 43, 45 (KBR's maintenance responsibilities); id. ¶¶ 24–26, 51 (award fee procedures); id. ¶¶ 57–58 (required electrical personnel qualifications). As stated above, the Court interprets the contract de novo, even as its provisions may relate to the question of whether the award fee determination was arbitrary and capricious. Burnside-Ott, 107 F.3d at 858, 860.

556 U.S. at 678. Therefore, the Court can draw the reasonable inference that the AFDO relied on inaccurate information.

Defendant structured both of its briefs around its argument that plaintiff has not pled facts sufficient for the Court to draw the reasonable inference that the AFDO or the CO acted arbitrarily or capriciously. Defendant does not, however, address plaintiff's primary allegation: that the AFDO relied on fundamentally inaccurate information. Instead, defendant cites to what it claims are the "four factors to be considered in determining whether an official acted in an arbitrary and capricious manner." MTD 6. These four factors are: "(1) evidence of subjective bad faith on the part of the official; (2) whether there is a reasonable, contract-related basis for the official's actions; (3) the amount of discretion given the official; and (4) whether the official violated [an] applicable statute or regulation." *Id.* Defendant attributes this four-factor test to *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999), which in turn cites *United States Fidelity & Guarantee Co. v. United States*, 676 F.2d 622, 630 (Ct. Cl. 1982).

Defendant places more emphasis on these four factors than is warranted in this context. The citation followed a discussion in *McDonnell* of "the proposition that a termination [of a contract by a CO] for default that is unrelated to contract performance is arbitrary and capricious." 182 F.3d at 1326. *McDonnell* then explained that this proposition is "but part" of the "law governing abuse of discretion by a contracting official." *Id. McDonnell* cited *U.S. Fidelity* as an example of a case explaining the law governing abuse of discretion by a contracting official. *Id.* The four factors are listed in a parenthetical explaining the citation to *U.S. Fidelity*. *Id.* But *McDonnell* did not apply that four factor test as defendant urges the Court to do in this case; it only considered the second factor: whether there was a contract-related basis for the CO's action. *Id.* at 1326–29. Additionally, *McDonnell* does not support defendant's contention that the Court's determination of whether the AFDO abused his discretion is limited to the four factors defendant cites.

The origin of these four factors appears to be *Keco Industries, Inc. v. United States*, 492 F.2d 1200, 1203–04 (Ct. Cl. 1974), *cited in U.S. Fidelity*, 676 F.2d at 630. Keco Industries, Inc. ("Keco") brought suit challenging the award of a contract to Keco's competitor. *Id.* at 1201. The Court of Claims held that the "ultimate standard" was "whether the Government's conduct was arbitrary and capricious toward the bidder-claimant." *Id.* at 1203. *Keco* then described "four subsidiary, but nevertheless general, criteria *controlling all or some of these claims*." *Id.* (emphasis added). *Keco* also clarified that the application of "these four general principles" depends on "the type of error or dereliction committed by the Government." *Id.* at 1204. Thus, it appears that the four factors were never intended to prevent courts from considering other factors when determining whether a contracting officer abused his or her discretion, particularly in contexts other than bid protests. Indeed, the Federal Circuit later stated that *Keco* involved a "far narrower" standard of review than APA review. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1331 (Fed. Cir. 2001). In *Impresa*, the court characterized the four factors as "criteria that were *generally relevant* to the determination" of whether the contracting officer's choice to select a different bid breached an implied contract

with the disappointed bidder plaintiff, a question different from the one presently before the Court. *Id.* (emphasis added).[11]

Defendant also argues, without further explanation, that plaintiff's allegation that the AFDO's decision was based on "fundamentally inaccurate information" is "not the same as stating that it was arbitrary and capricious." MTD 4. To the extent that defendant means that the Court does not conduct a *de novo* review of the AFDO's factual determinations, defendant is correct. *Whitney Nat'l Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 421 (1965); *Humane Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1325 (Fed. Cir. 2001) (describing the arbitrary and capricious standard as "'highly deferential' to the administrative agency's factual findings" (quoting *Shakeproof Indus. Prods. Div. of Ill. Tool Works Inc. v. United States*, 104 F.3d 1309, 1313 (Fed. Cir. 1997))). The Court is required, however, to review whether the AFDO's decision "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Nat'l Assoc. of Home Builders v. Defenders of Wildlife*, 551 U.S. 664, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Likewise, this court has held a contracting officer's incentive fee award decision to be arbitrary and capricious where the contracting officer relied on irrelevant and biased information. *North Star*, 76 Fed. Cl. 158, 204–05 (2007).

The factual allegations in plaintiff's complaint satisfy this standard. The AFDO's primary basis for his award fee decision appears to be that KBR failed to alert the Army to the unsafe conditions of the electrical wiring in RPC buildings. *See* Compl. ¶ 62. Plaintiff alleges both that it did alert the Army to those conditions, *id.* ¶ 42, and that the AFDO and the CO were aware that it had alerted the Army. *Id.* ¶¶ 56, 64–65, 68. Therefore, plaintiff has adequately pled that the AFDO's award fee decision was arbitrary and capricious because it ran counter to the evidence before the agency.

### D. Defendant Fails to Demonstrate That Plaintiff Is Necessarily Not Entitled to Damages

Plaintiff's complaint requests damages in the amount of $21,432,108.80, the amount it alleges plaintiff was due based on the AFEB's performance ratings. Compl. ¶¶ 51, 79. Defendant requests that the Court dismiss plaintiff's claim for damages. MTD 9–11. Defendant argues that "[i]t is well-settled that, when an agency's actions are not supported by the record before it or the agency failed to consider the proper factors (much as what KBR alleges here), the proper action by the court is a remand [to the agency]." *Id.* at 10 (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). Defendant also cites *North Star* as an example of a remand for correction of a contracting officer's arbitrary and capricious incentive fee

---

[11] Even if the *Keco* four-factor test were applicable in this context, plaintiff's complaint is nevertheless sufficient under that test to survive a motion to dismiss. As described above, plaintiff alleges that the AFDO's decision violated provisions of Clause H.36, leaving the decision without a contract-related basis. Additionally, plaintiff alleges that these contractual provisions are mandatory under LOGCAP III, thus leaving no discretion for the AFDO. Finally, plaintiff adequately pleads a violation of FAR 16.401(e)(2).

determination. 76 Fed. Cl. at 218. Defendant is correct that the Court's finding that the AFDO's award fee determination was arbitrary and capricious would ordinarily entitle plaintiff to a remand for a recalculation of the award fee and not an award of damages.

Plaintiff has also alleged, however, that the Army breached a duty set forth in Clause H.36 to calculate the award fee in accordance with the weighting scheme and conversion table. Compl. ¶ 62. Plaintiff's complaint does not specify whether the AFDO upheld or altered the AFEB's numerical evaluation ratings. Of course, if the AFDO decreased the AFEB's numerical ratings to zero, plaintiff would have no basis for its contention that the AFDO's determination was contrary to the evaluation weighting scheme and conversion table. Thus, plaintiff's complaint implies that the AFDO upheld (at least some of) the AFEB's numerical ratings and nevertheless decreased plaintiff's award fee to zero. Assuming that the AFDO did uphold the AFEB's numerical ratings and that plaintiff's interpretation of Clause H.36 is accurate, the Court could calculate damages with "reasonable certainty," *Spectrum Scis. & Software, Inc. v. United States*, 98 Fed. Cl. 8, 13 (2011), as there would be "no further discretion [for the AFDO] to exercise." *See* MTD 10 (citing *Boeing Co. v. United States*, 75 Fed. Cl. 34, 50–53 (2007)). Thus, the Court will not at this time dismiss plaintiff's claim for damages.

## CONCLUSION

In view of the foregoing, the Court hereby **GRANTS IN PART** and **DENIES IN PART** defendant's motion to dismiss. The Court **GRANTS** defendant's requests to dismiss plaintiff's claims for breach of the duty of good faith and fair dealing and violation of AFARS. The Court **DENIES** defendant's requests to dismiss plaintiff's claims that the AFDO's award fee decision breached Clause H.36, that the decision violated FAR 16.401, that it was arbitrary and capricious, and that the Court may award plaintiff damages.

Pursuant to RCFC 12(a)(4)(A)(i), defendant shall file its answer to plaintiff's complaint within fourteen (14) days after the filing of this Opinion. Thereafter, the Court will contact counsel to schedule a status conference to discuss the nature and timing of further proceedings.

**IT IS SO ORDERED.**

s/ George W. Miller
GEORGE W. MILLER
Judge

21